IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

PETERSON CONTRACTORS, INC.,

    Plaintiff,

vs.

THE TRAVELERS INDEMNITY
COMPANY,

    Defendant.

No. C14-0063

RULING ON MOTIONS FOR
PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.    INTRODUCTION ................................. 2

II.   PROCEDURAL HISTORY ........................... 2

III.  RELEVANT FACTS ............................... 3
    A.   *The Project* ................................. 3
    B.   *Cofferdam Failure* ........................... 3
    C.   *State Lawsuit* ............................... 4
    D.   *Insurance* ................................... 5

IV.  MOTIONS FOR PARTIAL SUMMARY JUDGMENT ............ 7

V.    DISCUSSION ................................... 8
    A.   *Was the University's Loss of Use Claim Caused by an
        "Occurrence?"* .............................. 8
    B.   *Does the University's Loss of Use Claim Constitute
        "Property Damage?"* ......................... 11
    C.   *Does the University's Loss of Use Claim Fall Within an Exclusion
        to the Policy?* .............................. 12

VI.  ORDER ....................................... 18

## I. INTRODUCTION

This matter comes before the Court on the Motion for Partial Summary Judgment (docket number 21) filed by Plaintiff on December 16, 2014, the Resistance (docket number 26) filed by Defendant on January 27, 2015, and the Reply (docket numbers 27 and 28) filed by Plaintiff on February 3.

Also before the Court is the Motion for Partial Summary Judgment (docket number 29) filed by Defendant on April 20, the Resistance (docket number 32) filed by Plaintiff on May 22, and the Reply (docket number 36) filed by Defendant on June 5.

Pursuant to Local Rule 7.c, the motions will be decided without oral argument.

## II. PROCEDURAL HISTORY

On May 20, 2014, Plaintiff Peterson Contractors, Inc. ("PCI") filed a complaint against Defendant The Travelers Indemnity Company ("Travelers"), seeking damages for breach of contract. PCI claims Travelers wrongfully failed to indemnify PCI for money it paid to a third-party to settle a claim for property damages arising from a cofferdam collapse on May 16, 2007. Travelers filed an answer on July 14, 2014, denying the material allegations and asserting certain affirmative defenses.

On October 16, 2014, the Court adopted a proposed Scheduling Order and Discovery Plan submitted by the parties. Also at that time, the case was referred to me for the conduct of all further proceedings and the entry of judgment, in accordance with 28 U.S.C. § 636(c) and the consent of the parties. After consulting with counsel, the case was scheduled for trial on November 16, 2015.

On December 16, 2014, PCI timely filed the instant motion for partial summary judgment. PCI argues that there are no genuine issues of material fact, and the Court should find, as a matter of law, that Travelers breached the insurance contracts by failing to defend and indemnify PCI. On April 20, 2015, Travelers timely filed its motion for

partial summary judgment, asking the Court to summarily dismiss PCI's "loss of use" claim.

## III. RELEVANT FACTS

### A. The Project

On December 21, 2006, the Board of Regents for the State of Iowa contracted with Maxwell Construction Company, Inc. ("Maxwell") for the construction of a chilled water project. The purpose of the project was to allow the University of Iowa ("the University") to use an existing chilled water facility on one side of the Iowa river to supply chilled water to the campus facilities on the other side of the river. The cost of the project was approximately $5.25 million. The project, known as the North Chilled Water River Crossing, included the construction of a cofferdam across the Iowa River to facilitate the installation of the chilled water piping in the riverbed. On January 22, 2007, Maxwell and PCI executed a subcontract, which included the installation of the cofferdam across the Iowa River by PCI. The cost of the subcontract was approximately $715,000. The project was to have been completed by July 2, 2007.

### B. Cofferdam Failure

On May 16, 2007, the cofferdam being constructed by PCI failed. According to its later claim for damages, PCI had performed and was paid for 34.26% of the cofferdam work before its collapse. Following the cofferdam failure, PCI was instructed to recover and rebuild the cofferdam. In September 2007, however, Maxwell terminated PCI and contracted with Iowa Bridge & Culvert, L.C. ("IBC") to complete the work. IBC completed construction of the cofferdam, but only after the University approved substantial changes to the cofferdam design. These changes were not part of the Project plans and specifications before Maxwell terminated PCI.

On July 19, 2007, the University wrote to Maxwell, responding to Maxwell's earlier letter making a claim for payment. The University's letter notes that "time is of

3

the essence" on the project, and gave Maxwell notice that the University intended to seek payment from Maxwell "for damages in the form of costs and expenses incurred as a result of the delay of this project's completion." (Pl. App. 119) The project was not completed until the summer of 2009. Because the pipe installed as part of the project could not be used until the project was completed, it was necessary for the University to pay for temporary chillers to cool the east side campus facilities during the summers of 2007 and 2008. On October 23, 2009, the University's Deputy General Counsel wrote to Maxwell's attorney, attaching a claim for "[e]xtra expenditures resulting from initial cofferdam failure and resulting breach of contract by not completing the Work within the contract period." (Pl. App. 137) The University's claims totaled approximately $1.26 million, with approximately $835,000 of that amount represented by the rental of temporary chillers.

Also included in the University's damage estimate was $75,000 for "[r]ecovery of project site following City of Iowa City siphon project." During the summer of 2008, the Iowa River suffered substantial flooding. Because the temporary replacement cofferdam was still in place at that time, it is claimed that the City of Iowa City sustained sanitary sewer system damage in the amount of $75,000.

### C. State Lawsuit

On April 6, 2010, Maxwell sued the University in the Iowa District Court for Johnson County, also naming PCI and others as defendants. Maxwell claimed PCI breached its contract "by failing to complete its work under that contract on the subject project in a timely fashion." According to the state court petition, Maxwell employed IBC to complete the work for a total contract price of approximately $1.35 million, which exceeded the price in the PCI subcontract by approximately $725,000. Maxwell asked that judgment enter against PCI for that amount.

There were multiple counterclaims and cross-claims filed in the state court action. In its answer and counterclaim, PCI denied any fault for the cofferdam failure and asserted

4

that Maxwell was at fault for providing PCI with a deficient cofferdam design. PCI claimed that it was owed for the costs it incurred to recover and rebuild the cofferdam after its collapse, in the approximate amount of $732,131.[1] The University sued PCI for negligence, and claimed its damages exceeded $1.2 million.

In December 2012, Maxwell, the University, PCI, and the other defendants in the state court action reached a settlement of all claims. As part of the settlement agreement, PCI paid Maxwell $439,875,[2] and released its claims against all other parties, including PCI's claim that Maxwell owed it $610,000.[3] During the course of the state court action, PCI incurred approximately $644,000 in legal fees.[4]

### D. Insurance

On July 14, 2006, PCI purchased a commercial general liability ("CGL") insurance policy from Travelers. On July 10, 2006, PCI purchased a commercial excess liability ("umbrella") insurance policy from Travelers. Both policies had a policy period from July 1, 2006 through July 1, 2007. The CGL policy provided $1 million of coverage for each occurrence, and the umbrella policy provided additional coverage to an aggregate of $10 million.

---

[1] That claim was later reduced to approximately $610,000.

[2] PCI paid on behalf of itself and Pro-firm, L.L.C. Pro-firm contributed to the settlement by paying PCI an undisclosed amount.

[3] Also as part of the settlement, Maxwell paid IBC the sum of $125,000, and released its claims against all of the other defendants. The University paid Maxwell $239,598.05, and released its claims against all of the other defendants, including PCI. Shive-Hattery, Inc. paid the University $86,250. NNW, Inc., paid Maxwell the sum of $60,125 and paid the University $477,500. V.J. Engineering paid the University $86,250.

[4] Of this amount, approximately $430,000 in legal fees and expenses were incurred before PCI's counsel wrote to Travelers on May 15, 2012 requesting an opportunity to meet "to discuss coverage issues."

After the cofferdam collapsed on May 16, 2007, PCI immediately notified Travelers. PCI asserts in its statement of facts that "Scott Skifstad from Travelers conferred with PCI regarding the cofferdam failure and informed PCI that there was no coverage for the University's claims." In support of its allegation, PCI refers to paragraph 45 of its complaint and Travelers' answer to the complaint. In its complaint, PCI claims that Skifstad *"incorrectly"* informed PCI that there was no insurance coverage. In its answer to the complaint, Travelers does not specifically admit or deny that Skifstad told PCI there was no coverage. However, Travelers admits that Skifstad conferred with PCI, and denies PCI's allegation that a statement denying coverage would be "incorrect."

Both parties also cite an email from Lauren Call, a safety director for PCI, to Cordell Peterson, another PCI employee, dated July 23, 2007. Call reports that she and Kevin Boyle, another PCI employee, had a discussion with Skifstad that afternoon. The email discusses whether Travelers would have to defend the University as an additional insured, or any engineering firm which might claim they were an agent of the University. The email states that "[t]he U of I could file a counter claim against PCI and there would be no coverage for this." (Pl. App. 225)

Apparently, PCI did not immediately tender the defense of the state court action to Travelers when PCI was sued in April 2010. After "reexamining" the issue, PCI provided Travelers with a written request for coverage on May 15, 2012 — after the case had been pending for two years. Travelers denied PCI's request for coverage on June 20, 2012. Travelers confirmed its coverage denial in letters dated July 12, 2012 and September 20, 2012. On November 20, 2012, PCI notified Travelers that the University had recently made an additional claim for damages in the amount of $75,000, relating to damages to the City's sanitary sewer system.[5] Travelers confirmed its denial of coverage in a letter

---

[5] Travelers does not seek summary judgment on this issue.

6

dated February 14, 2013. Travelers did not contribute any amount toward the settlement of the state court litigation.

## IV. MOTIONS FOR PARTIAL SUMMARY JUDGMENT

In its motion for partial summary judgment, PCI asks the Court to determine, as a matter of law, that Travelers breached the insurance contracts by failing to defend and indemnify PCI for property damage claims made against it. In its complaint, PCI calculates its damages by first noting that it was "defending against claims totaling approximately $1,985,000.00." (Maxwell was claiming approximately $725,000, representing the additional amount Maxwell was required to pay IBC to complete the work on the subcontract; and the University was claiming approximately $1.26 million against all other parties in the state court action, representing additional expenditures resulting from the cofferdam failure and the failure to complete the work within the contract period.) PCI claims it "paid" approximately $1,050,000 to settle the claims, consisting of a cash payment to Maxwell in the amount of $439,875, and PCI giving up its claim against Maxwell in the approximate amount of $610,000. (Some amount of PCI's cash payment was paid by Pro-firm, L.L.C.) PCI paid the University nothing. PCI reasons that because it "paid" 58.96% of the total damages asserted by Maxwell and the University in the state court action, Travelers was obligated to indemnify PCI for 58.69% [sic] of the amount "paid" by PCI, or approximately $616,000. The motion is a "partial" motion for summary judgment because PCI concedes that the amount of its damages cannot be determined summarily.

In its motion for partial summary judgment, Travelers asks the Court to determine, as a matter of law, that it was not required to defend against the University's "loss of use" claim, or indemnify PCI for any amount which PCI *may* have paid to settle the University's claim. Travelers disputes whether the cash payment made by PCI to Maxwell has any connection to the University's loss of use claim. (To settle the state court action,

the University paid Maxwell $239,598.05, while receiving $650,000 from other parties to that action, not including PCI.) The motion is a "partial" motion for summary judgment, however, because Travelers does not seek summary judgment regarding the $75,000 claim for damage to the sanitary sewer system, or to defense costs incurred after PCI notified Travelers of the additional claim on November 20, 2012.

## V. DISCUSSION

The CGL policy issued by Travelers to PCI obligated Travelers to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage.'" CGL Policy, Section I, ¶ (1)(a). (Pl. App. 026) The obligation to indemnify only applies if the property damage "is caused by an 'occurrence.'" *Id.*, Section I, ¶ 1(b)(1). PCI asserts that the University's loss of use claim is property damage caused by an occurrence, and falls within the coverage provided by the policy. Travelers argues, however, that even if PCI's payment to Maxwell is viewed as a payment to the University for "property damage" caused by an "occurrence," the claim is nonetheless excluded by exclusion (m) of the policy.

### A. Was the University's Loss of Use Claim Caused by an "Occurrence?"

The first issue in this case is whether the University's claims arise from "property damage" caused by an "occurrence" within the meaning of the policy.[6] The insurance policy defines an "occurrence" as "an accident."

---

[6] In calculating its damages in the complaint, PCI refers to claims made by Maxwell, the amount which it paid to Maxwell, and PCI's abandoned claim against Maxwell. In arguing that Travelers had a duty to defend and indemnify in this case, however, PCI's briefing focuses entirely on the University's claim for loss of use and the claim for damage to the sanitary sewer system. That is, PCI apparently does not claim Travelers had a duty to defend or indemnify PCI for the breach of contract claim made by Maxwell.

8

> "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

CGL Policy, Section V, ¶ 13. (Pl. App. 039) The umbrella policy contains identical language. The policy does not, however, define what constitutes an "accident." *Black's Law Dictionary* (10th ed. 2014) defines "accident" as "[a]n unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated; any unwanted or harmful event occurring suddenly, as a collision, spill, fall, or the like, irrespective of cause or blame." The Iowa Supreme Court has defined an "accident" as "an undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force." *Pursell Const., Inc. v. Hawkeye-Security Ins. Co.*, 596 N.W.2d 67, 70 (Iowa 1999) (quoting *Central Bearings Co. v. Wolverine Ins. Co.*, 179 N.W.2d 443, 448 (Iowa 1970)). *See also First Newton Nat. Bank v. General Cas. Co. of Wisconsin*, 426 N.W.2d 618, 625 (Iowa 1988) ("An accident, happening, event, or exposure to conditions is an unexpected and unintended 'occurrence' so long as the insured does not expect or intend both it *and* some injury.").

Travelers argues, however, that the cofferdam failure resulted from defective construction by PCI and, therefore, is not an "occurrence" within the meaning of the policy. In support of its argument, Travelers cites *Pursell Const.*, *supra*, and *Liberty Mutual Ins. Co. v. Pella Corp.*, 650 F.3d 1161 (8th Cir. 2011). I believe, however, that the facts in those cases are materially different than those presented here.

In *Pursell*, the insured was hired by a development company to provide cement work for two houses being built in a floodplain. The developer sued Pursell when it was discovered that the lowest level of each house fell below the floodplain, in violation of a city ordinance, thereby requiring extensive alterations. Pursell then sued its CGL insurer, claiming Hawkeye-Security had a duty to defend and indemnify. The Iowa Supreme Court

9

concluded that the developers' claim was "essentially one for defective workmanship," and there was no "accident" or "occurrence." 596 N.W.2d at 70. "[M]ere faulty workmanship, standing alone, cannot constitute an occurrence as defined in the policy, nor would the cost of repairing the defect constitute property damages." *Id.* at 71.

In the second case cited by Travelers, Pella was sued by persons claiming that windows manufactured by Pella leaked, causing premature wood rot and damage to their structures. Citing *Pursell*, the Eighth Circuit Court of Appeals concluded that there was no "occurrence" and, therefore, Liberty Mutual had no obligation to defend or indemnify. *See also W.C. Stewart Const., Inc. v. Cincinnati Ins. Co.*, 770 N.W.2d 850 (Iowa App. 2009) (Table), 2009 WL 928871 (when a subcontractor was sued for failing to properly perform grading services, there was no "occurrence" triggering coverage).

In each of the cases cited above, the insured had completed its work prior to any claim. That is, in each case a third-party claimed that the insured's completed work or product was defective, thereby causing the third-party damages. There was no sudden or calamitous event. In the instant action, however, PCI was in the midst of building a cofferdam, when it collapsed. I believe this "undesigned, sudden, and unexpected event" may properly be considered an "accident." *Pursell Const.*, 596 N.W.2d at 70. Obviously, it was an "unintended and unforeseen" event, and an "unwanted or harmful event occurring suddenly." *See Black's Law Dictionary* (10th ed. 2014). Accordingly, I conclude that the cofferdam failure in this case was an "accident," within the common meaning of the term — "irrespective of cause or blame," *Pursell Const.*, 596 N.W.2d at 70 — and, therefore, an "occurrence" within the meaning of the policy.

In its brief, however, Travelers adds an additional wrinkle to the analysis. That is, Travelers argues that the University's claim arises from PCI's failure to complete its work in a timely manner, *not* from the failure of the cofferdam *per se*. Travelers does not cite any authority for this additional argument, and I find it unpersuasive. The University's

10

claims arise from "extra expenditures" which it incurred when the project was not completed on time. The delay in completion was caused, at least in part, by the cofferdam failure. As discussed above, the cofferdam failure constitutes an "occurrence" within the meaning of the policy. Accordingly, I conclude that the University's claims were caused by an "occurrence."

### B. Does the University's Loss of Use Claim Constitute "Property Damage?"

Having concluded the University's claims were caused by an "occurrence," the Court must next determine whether the claims constitute "property damage" within the meaning of the policy. "Property damage" is defined in the policy as follows:

> "Property damage" means:
>
> (a) Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> (b) Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

CGL Policy, Section V, ¶ 17. (Pl. App. 040) Here, the University claims that the failure of the cofferdam was one cause for the delay in completing the chiller project. Because its use of the pipes transporting chilled water across the river was delayed for two years, the University was required to rent temporary chillers during the summers of 2008 and 2009, at a cost of approximately $835,000. Property damage is defined broadly in the policy to include loss of use of "tangible property," whether or not the tangible property sustained a "physical injury."

The Iowa Supreme Court addressed claims for loss of use in *First Newton Nat. Bank v. General Cas. Co. of Wisconsin*, 426 N.W.2d 618 (Iowa 1988). There, the bank was

11

sued by two farm families who alleged they had "lost all of their real and nearly all of their personal property" as a result of their financial transactions with the bank, and would "lose profits that would have been realized from their farming operations." *Id.* at 626. Interpreting policy language which was nearly identical to the definition of "property damage" found in this case, the Court concluded that the allegations were sufficient to meet the definition of "property damage," and that physical injury to the tangible property was not required before its loss of use is covered. *Id. Compare Continental Ins. Co. v. Bones*, 596 N.W.2d 552, 556 (Iowa 1999) (finding that when an insurance policy does not include the second part of the definition of property damage — Section V, ¶ 17(b) in this case — then "loss-of-use damages must arise from physical damage or destruction of tangible property").

I believe that the pipes which were being installed as part of the chiller project constituted tangible property within the common meaning of that term. Accordingly, the loss of use of the chiller pipes, and the resulting cost to the University, constitutes "property damage" within the meaning of the policy. That is, I conclude that the University's claim for loss of use caused by the delay in completing the chiller project constitutes property damage caused by an occurrence within the meaning of the policy.

### C. Does the University's Loss of Use Claim Fall Within an Exclusion to the Policy?

While the University's claim for loss of use constitutes property damage caused by an occurrence within the meaning of the policy, that does not end the analysis. Travelers argues that exclusion (m) of the policy excludes coverage. Exclusion (m) "is commonly called the 'impaired property' exclusion, and is included in a policy to prevent the insured from claiming economic losses resulting from the insured's work or work product." *Transcontinental Ins. Co. v. Ice Systems of America, Inc.*, 847 F. Supp. 947, 950 (M.D. Fla. 1994). Exclusion (m) states:

This insurance does not apply to:

. . .

m. "Property Damage" to "impaired property" or property that has not been physically injured, arising out of:

    (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

    (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

CGL Policy, Section I, ¶ 2(m). (Pl. App. 030)

The CGL defines "impaired property" as follows:

"Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

    (a) it incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    (b) your have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

    (a) the repair, replacement, adjustment or removal of "your product" or "your work"; or

    (b) your fulfilling the terms of the contract or agreement.

CGL Policy, Section V, ¶ 8. (Pl. App. 038)

13

In this case, the piping which was intended to be used with the chiller project meets the policy definition of "impaired property" and is "property that has not been physically injured." Accordingly, exclusion (m) provides that the "property damage" (*i.e.*, the University's loss of use damages) is not covered by the policy if they arise from "a defect, deficiency, inadequacy or dangerous condition" of PCI's work, or from a delay or failure in PCI "to perform a contract or agreement in accordance with its terms." Travelers argues that the University's claim for loss of use was caused by a delay in PCI performing the work required by its subcontract and, therefore, falls within the exclusion to coverage. PCI argues that because the University alleged PCI's negligence — rather than breach of contract — in the state court action, the claim does not fall within the exclusion.

In its answer filed in the state court action brought by Maxwell, the University filed a cross-claim against PCI. Count I of the cross-claim is entitled "Negligence." In support of its claim, however, the University also alleges that PCI breached its contract by failing to construct the cofferdams in compliance with the project designs.

> 7. Maxwell Construction entered into a sub-contract with Peterson Contractors to work on the project.
>
> 8. Peterson Contractors under the contract with Maxwell Construction was required to construct coffer dams during the project to enable construction of the project.
>
> 9. Peterson Contractors and Maxwell Construction changed the design and plans for the construction of the coffer dams.
>
> 10. Peterson Contractors and Maxwell Construction failed to build the coffer dams according to the design and plans.
>
> 11. The coffer dams constructed by Peterson Contractors and Maxwell Construction failed.

12. Peterson Contractors was negligent in the design and construction of the coffer dams.

The University's Cross-Claim against PCI (Pl. App. 220). Travelers argues that exclusion (m) applies to the facts in this case, regardless of the theory of liability asserted by the University.

This issue was recently addressed by the court in *M Consulting and Export, LLC v. Travelers Cas. Ins. Co. of America*, 2 F. Supp. 3d 730 (D. Md. 2014). There, an exporter contracted with a wine wholesaler to provide 500 cases of wine for shipment to West Africa. When the shipping container arrived, however, it only contained 300 cases. The exporter then sued the wholesaler for breach of contract and negligence, and obtained a default judgment in state court. The exporter then filed an action against Travelers Insurance Company, which insured the wholesaler at the time. Travelers argued, among other things, that even if the exporter's loss fell within the general scope of coverage, the loss was excluded from coverage under exclusion (m). The exporter argued that exclusion (m) was inapplicable because the underlying lawsuit involved a claim of negligence against the insured. Applying Maryland law, the court rejected the exporter's argument.

> Nevertheless, Plaintiff's characterization of the suit is not dispositive of the matter. As this Court has previously noted, under Maryland law, the theory of liability employed by the Plaintiff does not affect the analysis. *See Insights Trading Group*, 2010 WL 2696750, at *5 ("Courts have found that litigants cannot skirt around an exclusion clause merely by relying upon certain alternative theories; indeed, an exclusion clause must apply 'irrespective of the theory of liability by which the [the claimant] seeks redress for his injury, as the ["arising out of"] policy exclusion is not concerned with theories of liability.'" (quoting *EDP Floors*, 311 Md. at 230, 533 A.2d 682.)); *Travelers Indem. Co. of Am. v. Coleman Auto. of Columbia, LLC*, 236 F. Supp. 2d 513, 516 (D. Md. 2002) ("It is the substance of the underlying claim, not its label, that controls in duty-to-defend and coverage cases.").

> Rather, the main focus is the "instrumentality of the injury." *Id.* The exclusion at issue here is directed at an injury arising from the deficient performance of a contract. As noted above, despite Plaintiff's characterization of this action as one involving negligence, the loss for which Plaintiff seeks to recover is the result of Cork N Bottle failing to perform under the contract. *Cf.* Def.'s Mot. Summ. J. Ex. B ¶ 25 ("[Cork N Bottle] owed to Plaintiff as purchaser of the shipment, a duty of due care. . . ." (emphasis added) (quoting Plaintiff's Complaint in underlying Maryland state action, *M Consulting and Export, LLC v. Wine & Spirits Expo, LLC*, NO. 24-C11-2261)).

*M Consulting*, 2 F. Supp. 3d at 740.

Applying Minnesota law, the court in *Corn Plus Co-Op. v. Continental Cas. Co.*, 516 F.3d 674 (8th Cir. 2008), found that the "impaired property exclusion" applied in similar circumstances. In that case, Corn Plus contracted with a general mechanical contractor to perform welding work in an expansion of its ethanol facility. Because of the contractor's defective welding of pipes, corn mash became contaminated and required the plant to be shut down during repairs. In a state court action between the two parties, the contractor stipulated to negligence in its welding. *Id.* at 677. After reaching a settlement, Corn Plus sued the contractor's insurer, claiming damages. The district court ruled that property damage caused by the contractor's faulty welding triggered coverage under the insurance policy. The Court further concluded, however, that policy exclusions "precluded coverage for repairing the defective welding and its consequential cost, as well as for loss of use of the facility." *Id.* at 678. The Eighth Circuit Court of Appeals affirmed. *Id.* at 680 ("We conclude that the district court did not err in finding that the damage to your work exclusion and the impaired property exclusion bar coverage for the costs associated with repairing the faulty welding and for loss of the facility's use due to the incorporation of the defective welds.").

The parties have not cited any Iowa authority directly on point, and the Court has found none. In *Westview, Inc. v. Iowa Mut. Ins. Co.*, 728 N.W.2d 224 (table), 2006 WL 3802154 (Iowa App.), a corporation engaged in dairy operation contracted with a builder to construct a pole barn. A wind storm knocked over the building before it was completed, and construction was delayed. *Id.* at *1. Westview sued the contractor under theories of negligence, breach of contract, and breach of warranty. In addition to the direct damage to the building, Westview claimed it suffered consequential damages "due to lost milk production as a result of the delay in the construction of the pole barn." The contractor's insurance company, Iowa Mutual, asserted that there was no coverage for Westview's claim of consequential damages. Iowa Mutual agreed to defend under a reservation of rights. The attorney hired by Iowa Mutual filed a motion for summary judgment based on the economic loss doctrine. That is, it was argued that "Westview's claims for construction delays and improper construction were not tort claims, but rather should be considered contract claims." *Id.* The district court agreed and dismissed the negligence claim against the contractor. The contractor eventually signed a confession of judgment in favor of Westview, and assigned his rights against Iowa Mutual to Westview. Westview then sued Iowa Mutual, attempting to collect on the policy. The Iowa Court of Appeals concluded that because "Westview was seeking damages based on loss of use of dairy cows, which were not physically injured in the wind storm, due to a delay or failure by [the contractor] to perform a contract in accordance with its terms," exclusion (m) applied and there was no coverage under the policy.

In *Spirtas Co. v. Nautilus Ins. Co.*, 897 F. Supp. 2d 790 (E.D. Mo. 2012), the general contractor of a highway project claimed damages against a subcontractor (Spirtas) when the subcontractor's failure to properly demolish a bridge resulted in a delay in the project. Spirtas filed an action against its insurance company, seeking declaratory judgment for coverage on the claims being asserted. The Court found that the insurance

17

company "met its burden to show that the 'impaired property exclusion,' Exclusion m, bars coverage because all sums involved resulted from Plaintiff's failure 'to perform a contract or agreement in accordance with its terms.'" *Id.* at 801-02. It should be noted that the general contractor had not yet sued Spirtas for its alleged damages, but instead had withheld payment to Spirtas from amounts otherwise owed on the subcontract. Accordingly, the contractor's claim was not labeled as "breach of contract" or "negligence."

Turning to the facts in the instant action, the "negligence" alleged by the University in its cross-claim against PCI is the alleged failure of PCI to construct the cofferdam as required by the subcontract. Under the circumstances of this case, I find that the University's decision to label its claim as one of "negligence," rather than "breach of contract," does not affect the coverage provided by the policy, or the application of exclusions contained in the policy. Because the University's loss of use claim arises out of a delay or failure by PCI to perform under the subcontract, I conclude that exclusion (m) excludes coverage for that claim. Accordingly, PCI's motion for partial summary judgment will be denied and Travelers' motion for partial summary judgment will be granted. Travelers does not seek summary judgment on property damage allegedly sustained by the City of Iowa City, or the defense costs incurred after PCI sent a letter regarding the claim on November 20, 2012. This case will proceed in its ordinary course on PCI's remaining claims.

## VI. ORDER

IT IS THEREFORE ORDERED as follows:

1. The Motion for Partial Summary Judgment (docket number 21) filed by Peterson Contractors, Inc. is **DENIED**.

2. The Motion for Partial Summary Judgment (docket number 29) filed by The Travelers Indemnity Company is **GRANTED**.

3. This case will proceed in its normal course on the remaining claims made by Peterson Contractors, Inc.

DATED this 1st day of July, 2015.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA